WILLIAM J. DE SALVATORE, Defendant below, Appellant, v. STATE OF DELAWARE, Appellee.

(*June* 3, 1960.)

SOUTHERLAND, C. J., WOLCOTT and BRAMHALL, J. J., sitting.

*Robert C. O'Hora* and *John P. Daley* for appellant.

*Clement C. Wood*, Chief Deputy Attorney-General, and *Murray M. Schwartz*, Deputy Attorney-General, for appellee.

Supreme Court of the State of Delaware, No. 68, 1959.

WOLCOTT, J.:

This is an appeal from a conviction before a Superior Court Judge, in the absence of a jury, of driving a motor vehicle under the influence of intoxicating liquor. The bases of the appeal are the denial by the trial judge of the following defense motions: (1) to suppress intoximeter test results by reason of the State's failure to produce for inspection one component part of the intoximeter; (2) to suppress the testimony of the officers taking the defendant into custody by reason of an asserted lack of authority to make an arrest; (3) to suppress evidence on the basis of an asserted invalidity of the "Uniform Arrest Act" (11 *Del. C.* § 1902); and (4) an objection to questions addressed by the prosecution to the State Chemist designed to elicit an opinion concerning the physical condition of a man with 0.243 percent of blood alcohol by weight.

The facts involved in this prosecution are briefly summarized.

At approximately 1:00 A.M. on February 2, 1959, two uniformed Delaware Memorial Bridge guards, known generally to the community as "Bridge Police", were proceeding south on Route 13 approaching the overpass of Basin Road, a point three or four miles south of the Delaware Memorial Bridge. The two officers noticed a car cross the grass plot dividing the north and

south lanes of Route 13 at a point where there was no legal crossover. The car, thus observed, drove into the parking lot of a diner immediately to the south of the Basin Road overpass and stopped. The two officers followed in the patrol car and pulled up alongside the observed vehicle.

The driver of the car, who turned out to be this appellant, was requested to get out of his car. He did so slowly and leaned against the open door of his car. He emitted the odor of alcohol. He appeared unsteady on his feet. When asked for his registration and license, he fumbled in finding them. He admitted to having had some beer to drink. The officers concluded the appellant should be given a sobriety test, which he agreed to submit to.

Before leaving the parking lot, and after the appellant had given in response to questions his name and address, the officers told him he was being placed under a two hour detention for the purposes of the sobriety test and that at the end of that period he would either be released or a charge would be placed against him. Appellant voluntarily went with the officers to the police station, although in no event, the officers testified, would they have permitted him not to have accompanied them.

At the police station the appellant was administered physical co-ordination tests. His attitude changed from co-operative to indifferent to insulting. His speech was confused. His eyes were watery, his balance and walk were "swaying", and he was "uncertain" on the finger-to-nose and picking up coins tests. His language became abusive and obscene when he was told a charge would be placed against him. Prior to this, he had been given an intoximeter test which, on later analysis, showed a 0.243 percent of blood alcohol by weight.

The above-described events were concluded within forty minutes from the time the appellant first drove into the parking lot. The officers then placed the appellant in formal arrest. At the time they had no warrant for his arrest. At 2:00 A.M. for-

mal charges of driving a motor vehicle while under the influence of intoxicating liquor were placed against appellant before a local justice of the peace. Thereafter, the appellant was delivered to the county jail. In due course, he was tried and convicted in the Superior Court from whence comes this appeal.

Appellant challenges the right of the State to use the evidence collected within two hours of his original detention citing *Rickards v. State*, 6 *Terry* 573, 77 *A.* 2d 199, for the exclusion of illegally obtained evidence at the subsequent trial. His attack is threefold. First, it is argued that the Bridge police, having only the powers of constables, have no power to arrest on view for violation of the Motor Vehicle Code. Second, assuming the power to arrest for violation of the Motor Vehicle Code, a Bridge policeman may exercise such power only on the Bridge or its approaches, which appellant defines as excluding the Basin Road overpass, and, third, that 11 *Del. C.* § 1902, the so-called Uniform Arrest Act, is unconstitutional as authorizing detention without probable cause. On the basis of these arguments, he urges us to rule that his detention was illegal, thus paving the way for the application of the rule of *Rickards v. State.*

By 17 *Del. C.* Ch. 4, the Delaware Interstate Highway Division of the State Highway Department was created and charged with the duty of operating the existing Delaware Memorial Bridge. By § 409 the Division is authorized to establish regulations respecting the use of the Delaware Memorial Bridge and, to that end, is authorized by § 411 to employ such guards as are deemed advisable for the proper operation of the Bridge. It is enacted that such guards shall have the powers of a constable in the performance of their duties. The guards, thus authorized, now constitute the uniformed police force maintained by the Delaware Interstate Highway Division.

Appellant argues that the Bridge police have only the powers of arrest of a constable which are limited by 10 *Del. C.* § 2723 to the power to arrest only for breaches of the peace com-

mitted in the constable's presence. He argues further that since 21 *Del. C.* § 701, authorizing certain officers to make arrests for violations of the Motor Vehicle Code, was amended by 48 *Laws,* Ch. 195 to omit constables from the listed officers having power to arrest for traffic violations, it follows that the Bridge police have no authority to make an arrest for a traffic violation.

We doubt that this technical argument is sound for the reason that the very nature of their employment requires the Bridge police to enforce the traffic laws on the Bridge, and we think they might well fit within the class described in 21 *Del. C.* § 701 as "other police officers". We are not required to so hold, however, for there is another and complete answer to the argument.

By 11 *Del. C.* Ch. 19, the so-called Uniform Arrest Law, a peace officer, defined as "any public officer authorized by law to make arrests in a criminal case", is authorized by § 1902 to detain for investigation for a period of not in excess of two hours any person reasonably suspected of having committed a crime, and at the end of that time either release him or arrest him and charge him with a crime. It is specifically enacted that such detention shall not be an arrest.

We think it axiomatic that constables, and thus Bridge police, are peace officers within the meaning of § 1902 since they have the authority to make arrests in a criminal case. Irrespective, therefore, of the right of the Bridge police to make arrests pursuant to 21 *Del. C.* § 701, they have the right to detain and arrest under 11 *Del. C.* § 1902.

However, appellant argues that assuming 11 *Del. C.* § 1902 authorizes the Bridge police to detain and arrest, still that authority may be exercised only within the limited area over which the Delaware Interstate Highway Division has control, *viz.,* the Bridge proper and, possibly, its approaches. Since the point at which the appellant was originally detained is admittedly

outside of that limited area, it is argued that the detention was illegal.

▮▮▮ As a general rule, in the absence of statutory or constitutional authority, peace officers, including constables, cannot act outside of the territorial limits of the body from which they derive their authority. 80 *C. J. S.* Sheriffs and Constables § 36 b; *Lawson v. Buzines,* 3 *Harr.* 416. We note, however, that the authority conferred by 11 *Del. C.* § 1902 is not limited territorily by its terms, and that by 10 *Del. C.* § 2721 the jurisdiction of constables extends throughout the county of their appointment. We think, therefore, that the Bridge police, as peace officers, are authorized by statute to make arrests and to detain suspects at least within the confines of New Castle County.

Next, appellant argues that 11 *Del. C.* § 1902 is unconstitutional because it permits a peace officer to stop any person who he has "reasonable ground to suspect" has committed a crime, as distinguished from detaining upon "reasonable ground to believe", which appellant says is the constitutional requirement for lawful detention and arrest without a warrant. Appellant argues that arrests or detentions without warrant are constitutional only when made on "probable cause" and not on mere suspicion. He cites numerous Federal authorities in support. We may assume that he is correct in arguing that arrests without warrant may be made only upon probable cause.

We point out, however, that 11 *Del. C.* § 1902 purports to govern, not arrests for crime which are governed by 11 *Del. C.* § 1906, but detentions of persons in the course of the investigating of crime. Such police practice has long been recognized as valid by the courts when kept within reasonable bounds. *Cf. United States v. Bonanno, D. C.,* 180 *F. Supp.* 71, and *People v. Henneman,* 367 *Ill.* 151, 10 *N. E.* 2d 649. This court, also, has upheld the investigatory power of the police to detain for questioning. *Wilson v. State,* 10 *Terry* 37, 50, 109 *A.* 2d 381, 388.

We can find nothing in 11 *Del. C.* § 1902 which infringes on the rights of a citizen to be free from detention except, as appellant says, "for probable cause". Indeed, we think appellant's attempt to draw a distinction between an admittedly valid detention upon "reasonable ground to believe" and the requirement of § 1902 of "reasonable ground to suspect" is a semantic quibble. We point out that in *Wilson v. State,* in referring to the arrest of the defendant, we said, "Nor can it be doubted that the arrest was legal, that is, upon reasonable suspicion of felony." [10 *Terry* 37, 109 *A.* 2d 390.] In this context, the words "suspect" and "believe" are equivalents.

We hold, therefore, that 11 *Del. C.* § 1902 is constitutional. We hold further that the recited facts concerning this detention more than satisfy the statutory requirement of grounds of belief or suspicion in the mind of the detaining officer. Not only did the appellant commit a violation of the Motor Vehicle Laws (crossing the grass plot) in the presence of the officers, but upon talking to him the officers had more than reasonable grounds to believe he had committed another violation in their presence (driving under the influence of liquor). We think the officers could have exercised their authority at that time under 11 *Del. C.* § 1906 and have placed the appellant under arrest.

We, accordingly, hold that there is no taint of illegality in the detention and charging of the appellant, and that, therefore, the rule of *Rickards v. State, supra,* did not require the suppression of the evidence in question.

Appellant argues, also, for the suppression of the results of the analysis of the percentage of alcohol in his blood made from the intoximeter test. The basis for the argument is the failure of the State to produce for appellant's inspection one component of the apparatus used in the test. That component is described as the ascarite tube.

An intoximeter consists of three main parts, (1) a balloon with mouthpiece; (2) a fritted glass impregnated with sulphuric acid and potassium permanganate, and (3) a chemical train consisting of two connected glass tubes containing certain chemicals. The first tube, into which the breath is first passed, contains magnesium perchlorate which absorbs the moisture and alcohol from the breath. Thereafter, the breath passes into the second, or ascarite, tube which absorbs the carbon dioxide from the breath.

The process of analysis requires the chemist by distillation to determine the amount of alcohol absorbed in the first tube. The chemical contents of the first tube are all used up in the distillation process. The quantity of breath in which the amount of alcohol was contained is determined by the chemist from the differential in weight of the ascarite tube before and after the taking of the intoximeter test. On the basis of these two items, it is then possible to compute the percentage of alcohol in the subject's blood.

It appears that it is not the practice of the State Chemist, who makes the required analysis, to retain the ascarite tube used in a particular test for the reason that it is thereafter unusable. Rather, the practice is to return the tube to the manufacturer in order to obtain a refund on the cost.

Prior to the trial, appellant moved for production for his inspection of the ascarite tube. The State was unable to produce the tube because of the policy of returning the used tubes to the manufacturer. Appellant thereupon moved to supress the analysis of the intoximeter test on the ground that his rights have been violated by the inability to examine the ascarite tube, and on the further ground that the tube, itself, was the best evidence and since it was destroyed by the State the State may not offer secondary evidence of the test.

The results of the intoximeter tests are admissible in evidence in this State by reason of 11 *Del. C.* § 3507 authorizing

the admission into evidence of a chemical analysis of the breath of any person in cases where the issue is whether such person was or was not under the influence of intoxicating liquor.

Appellant does not argue, as of course he could not, that this analysis is inadmissible in evidence. The statute precludes that argument. He does argue that the State's failure to produce for his inspection one of the components has deprived him of an important right—that of an opportunity to demonstrate, possibly, the inaccuracy of the analysis. He cites several authorities in support of his argument that the failure to produce for inspection and analysis material, the character of which is in issue, is reversible error. *Cf. State v. Bramhall,* 134 *La.* 1, 63 S. 603, and an unreported case in the Federal District Court for Delaware, *United States v. City Dressed Beef Co., Inc.,* Civil Action No. 1426.

The authorities cited, however, are not in point, for in them it was possible to produce at least some of the material to be analyzed. In the case of intoximeter tests the material necessary to the making of the analysis is necessarily used up in the process. The only remaining element, the ascarite tube, furthermore sheds no meaningful light on the results since, by itself, it does not determine the final analysis.

In the case before us it appears that the ascarite tube went out of the possession of the State in accordance with the practice followed in several thousand such analyses before the appellant moved to produce for inspection. In our opinion the State has committed no error in disposing of an apparently useless tube in the absence of a request by the appellant to preserve it. Particularly is this so when chemical analysis of substances made by qualified chemists are as a matter of course received in evidence without the production in evidence of the substance itself. 2 *Wharton's Criminal Evidence* (11th Ed.), §§ 788, 1002. We express no opinion, however, on what would result if timely application for inspection of the component parts had been made.

 Next, appellant argues that the ascarite tube was the best evidence of the result of the test, and that, therefore, the chemist's analysis should have been rejected. The answer to this contention is that, alone, the ascarite tube proves nothing with respect to blood alcohol content. The so-called Best Evidence Rule comes into play only when the secondary evidence offered, of itself, shows that better evidence exists of the fact sought to be proved. 1 *Wharton's Criminal Evidence* (11th Ed.), §§ 366, 387. Secondary evidence is excluded not because it is necessarily inferior in probative quality, but because it, itself, presupposes that direct primary evidence is held back. To state the rule is to show its inapplicability in this case.

 Finally, appellant argues that it was error to permit the State Chemist to testify in answer to a question as to whether or not in his experience he had seen any individual with a 0.243 blood alcohol by weight reading who would not be under the influence of alcohol. Over the defense objection he answered that he had never found anyone with a reading of 0.243 who was capable of operating a motor vehicle.

Appellant objects on the ground that the witness had not been qualified as an expert, and that the statute permits only the admission into evidence of the results of the analysis without comment from the witness.

We think the objection is without merit. Similar testimony has been given by qualified chemists in other jurisdictions and upheld on appeal, even in trials before a jury which is not this case. *Commonwealth v. Capalbo*, 308 *Mass.* 376, 32 *N.E.* 2d 225; *People v. Markham*, 153 *Cal. App.* 2d 260, 314 *P.* 2d 217; *State v. Libby*, 153 *Me.* 1, 133 *A.* 2d 877; *State v. Cline*, 135 *Mont.* 372, 339 *P.* 2d 657. And see 2 *Wharton's Criminal Evidence* (11th Ed.), § 1001.

For the foregoing reasons, the conviction below is affirmed.